# IN THE DISTRICT COURT OF THE UNITED STATES
# FOR THE WESTERN DISTRICT OF NORTH CAROLINA
# ASHEVILLE DIVISION
# 1:11cr11

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| Vs. | ) | ORDER |
| | ) | |
| DAVID JOSEPH GEARING. | ) | |
| _____ | ) | |

**THIS MATTER** is before the Court upon the Government's request for a hearing pursuant to 18 U.S.C. § 4246(e) asking the Court to determine if Defendant has recovered from his mental disease or defect to such an extent that his release would no longer create a substantial risk of bodily injury to another person or serious damage to the property of another (#25). On February 5, 2014 the Court held a hearing on this matter. Defendant's counsel, Fredilyn Sison, was present, and Defendant was present through the use of a video camera system from his location at the Federal Medical Center in Butner, North Carolina. The Government was represented through Assistant United States Attorney Don Gast. From the evidence offered and the records in this cause, the undersigned makes the following findings.

**Findings.** In a bill of indictment issued on February 2, 2011, Defendant was charged with being a person who, having previously been committed to a

mental institution, did possess firearms in violation of 18 U.S.C.§ 922(g)(1)(12) (#1). Thereafter, Defendant's counsel moved for a psychiatric evaluation of Defendant pursuant to 18 U.S.C. § 4241(a). The undersigned entered an Order (#10) allowing this motion and directed that an examination be made of Defendant. An examination was made of Defendant and on June 7, 2011, a report (#13) was filed concerning the examination. A hearing was held by the undersigned on June 9, 2011, and at that time the undersigned found that, based upon the information in the report, Defendant was not presently competent to stand trial and Defendant was mentally incompetent to the extent he was unable to understand the nature and consequences of the proceedings (#14). The undersigned then directed that Defendant be committed to the custody of the Attorney General for continued treatment at a suitable medical facility to determine whether or not there was a substantial likelihood that in the foreseeable future Defendant would attain the capacity to permit the trial to proceed (#14).

On January 31, 2012, a report (#16) was filed by Sarah M. Revell, Complex Warden of the Federal Medical Center in Butner, North Carolina. In the report, Adeirdre Stribling Riley, PhD, the treating psychologist and Dr. Ralph Newman, the treating psychiatrist, provided the opinion that Defendant required treatment with antipsychotic medications and requested that the Court enter an Order

directing Defendant be administered these medications.  The government filed a motion (#18) requesting an Order that Defendant be involuntarily medicated in an attempt to restore his competency.  The undersigned entered an Order (#19) ordering that the medical providers at the Federal Medical Center in Butner, North Carolina involuntarily medicate Defendant in accordance with the proposed treatment plan.

On December 3, 2012, a report (#20) was filed by Dr. Stribling Riley and Dr. Newman, which stated that Defendant was continuing to suffer from a mental disease or defect rendering him mentally incompetent to the extent he was unable to understand the nature and consequences of the proceedings against him or to assist in his own defense.  It was the opinion of Dr. Stribling Riley and Dr. Newman that there was not a substantial probability that Defendant's competency could be restored in the foreseeable future.  In the report, Dr. Stribling Riley and Dr. Newman provide the following opinion:

> Regarding his competency to stand trial, Mr. Gearing's degree of disorganization, severity of thought disorder and preoccupation with delusions is such that he is unable to define the roles of various court personnel, name or explain the available pleas or acknowledge his charges and possible penalties.  As a result of his psychosis, to include responding to internal stimuli, he would be unable to conform his behavior to the courtroom.  He exhibits significant limitations in his capacities to assist counsel, which arise from his thought disorder and confusion.  These limitations are due to his chronic psychosis.  We view him as lacking a rational and factual understanding of the

3

> charges and proceedings against him and as remaining unable to properly assist in his defense.
>
> Due to his pervasive persecutory and grandiose delusions, Mr. Gearing is incapable of working with his attorney with a reasonable degree of rational understanding to plan a legal strategy. It is our opinion that Mr. Gearing suffers from a mental disease or defect, namely Schizophrenia, Undifferentiated Type, which significantly interferes with his rational understanding of relevant legal proceedings and his ability to assist counsel in his defense. We do not believe there is a substantial likelihood that further treatment will lead to improvement to such an extent his competency to proceed would be restored.

(Forensic Report, Doc. # 20, pp, 8 & 9.)

On December 20, 2012, Defendant's counsel filed a Motion for Risk Assessment Evaluation (#21) in which it was requested that the Court enter an order directing that an examination be made of Defendant by the psychological team working with Defendant to make a determination as to whether the release of Defendant would create a substantial risk of bodily injury to another person or serious damage to the property of another. On January 10, 2013, the undersigned entered an Order (#22) allowing the motion and directed that such an examination be made of Defendant.

By letter and report dated March 27, 2013, Warden Apker of the Federal Medical Center in Butner, North Carolina, reported as follows:

> In the opinion of the Risk Panel and his evaluators, Mr. Gearing is not suffering from a mental disease or defect as a result of which his

release would create a substantial risk of bodily injury to another person or serious damage to the property of another. I have enclosed the report prepared by our staff reflecting these opinions.
(#23, p. 1.)

Attached to the letter was the Forensic Evaluation report of Dr. Stribling Riley and Dr. Newman. In the report, Dr. Stribling Riley and Dr. Newman state:

> **Summary And Opinion of Risk of Dangerousness:** Title 18, United States Code, §4246 outlines procedures for commitment of a person presently suffering from a mental disease or defect such that his release would create a substantial risk of bodily injury to another person or serious damage to the property of another. In response to the Court's order, a Rick Assessment Panel was convened on 02/14/13 to examine whether Mr. Gearing met the criteria for continued commitment under §4246. During the Risk Panel, we considered that many of Mr. Gearing's functional abilities have been decreased due to his medical condition. Mr. Gearing is currently compliant with medication and has achieved a significant reduction in his mental health symptoms. Nevertheless, he has not gained sufficient insight into his condition and associated behavioral disturbances. With careful consideration of the risk and protective factors, the Risk Assessment Panel and evaluators opined that Mr. Gearing suffers from a mental illness, namely Schizophrenia, Undifferentiated Type but that due to medical complications, his release from custody would not present a substantial risk of bodily injury to another person or serious damage to the property of another. Ultimately, the Court must determine whether the probability of a future violent act, the potential magnitude of harm, the frequency with which violence may occur, and the imminence of harm Mr. Gearing presents rises to the level of "substantial risk" pursuant to Title 18, United States Code, §4246.

The reports (#16, #20, #23, #24) set forth the background information concerning Defendant's life. The Defendant is the youngest of four brothers born

to William and Margaret Gearing. (#23, p. 5.) Defendant was initially raised in Michigan, but the family moved to Transylvania County, North Carolina when Defendant was in the ninth grade. (#23, p. 5.) Defendant did not adjust well to the move to North Carolina and attempted to run away from home. (#23, p. 5.) Defendant then lived with one of his brothers for a short period of time. (#23, p. 5.) Defendant attended Brevard College in Brevard, North Carolina and later obtained a Bachelor's degree in physics from the University of North Carolina at Greensboro, North Carolina. (#23, p. 5.) Defendant was then required by his father to live at the family home in Transylvania County. (#23, p. 6.) Defendant has never had steady employment, has no friends, and is reclusive. (#23, p. 6.) Defendant has never married, and he has no children. (#23, p. 6.) The reports do not show that Defendant has ever abused alcohol or controlled substances and they do not show he has ever committed any act of violence.

In January 2008, Defendant experienced a command auditory hallucination, which directed him to drive to Washington, DC to deliver an important message to the Federal Bureau of Investigation. (#23, p. 6.) In that month, Defendant reportedly attempted to make an unlawful entry into the FBI building in Washington, DC. (#23, p. 6.) He was detained and civilly committed to St. Elizabeth's Hospital in Washington, DC, where he was diagnosed as

Schizophrenic. (#23, p. 7l.) Defendant was then released after an injection of psychotropic medication, and he returned to his parents' home in Transylvania County. (#23, p. 7.) For a two month period after his release from the St. Elizabeth's Hospital, Defendant showed improvement. (#23, p. 7.) He ate dinner with his family for the first time in ten years and also was involved in conversations with them. (#23, p. 7.) Defendant, however, did not follow up with counseling or psychiatric appointments and gradually decompensated to his previous level of functioning. (#23, p. 7.) By the end of 2010, Defendant had become paranoid and expressed the belief that one of his brothers was trying to kill him by radiating his food. (#23, p. 7.) Defendant installed some type of device on the family refrigerator so he could tell if someone attempted to open it. (#23, p. 7.) He also cut a hole in the floor of his bedroom so he could watch the refrigerator. (#23, p. 7.)

According to a Report of Investigation on January 17, 2011, Defendant went into the Brevard Police Department in Brevard, North Carolina and attempted to open a locked door so he could go into a secured area. (#23, p. 7.) A police officer noticed that Defendant was talking to himself, and Defendant requested to speak to a supervisor. (#23, p. 7.) Defendant then left the police station. (#23, p. 7.) A short time thereafter, Defendant was observed to be operating a vehicle on West

Main Street in Brevard. Defendant's vehicle was then stopped by officers. (#23, p. 8.) The officers asked if he had any weapons, and it was found that Defendant had a .30 caliber rifle in the trunk of his car along with 216 rounds of .30 caliber ammunition, 43 rounds of .38 caliber ammunition, 77 rounds of 9mm ammunition and fireworks. (#23, p. 8.) Defendant also stated that a bomb was in the trunk of the car, but no bomb was found. (#23, p. 8.) After being detained, Defendant refused to allow his family members to visit, but he did make a list of fictitious visitors consisting of three sisters and two wives, none of which existed in reality. (#23, p. 8.)

At the time of his initial admission for the purpose of examination, Defendant was found to be gaunt, disheveled and disorganized. (#16, p. 7.) His grooming, hygiene, and dentition were found to be poor. (#16, p. 7.) His speech was poorly articulated and he had thought disorder classified as perseveration. (#16, p. 7.) Defendant was found to present with persecutory and grandiose delusions. (#16, p. 7.) He refused medication and medical assessment. He also refused institution-prepared food. (#16, p. 8.) While hospitalized Defendant became gaunt and emaciated. (#16, p. 8.) He refused to eat institution-prepared food or commercially prepared food and had the delusion he was being poisoned. He refused to voluntarily take any medication. (#16, p. 10.)

An Order (#19) was entered by the undersigned on June 12, 2012 ordering that the medical providers at the Federal Medical Center involuntarily medicate the Defendant. At that time, Defendant was noted to engage in hand-washing and obsessive cleaning of his cell to the extent his nails thinned and his skin was erythematous. (#20, p. 3.) After the Order was entered directing that the Defendant be involuntarily medicated, the Defendant continued to refuse to eat. (#20, p. 4.) Defendant remained preoccupied with delusional ideation and compulsive hand washing to the extent he was not obtaining adequate nutrition. (#20, p. 9.) By September 2012, Defendant had cogwheel rigidity of his neck and both upper and lower extremities. (#20, p. 5.) There was no notable improvement in compulsive hand washing. (#20, p. 5.) In October 2012, Defendant was noted to require twenty-four hour nursing care due to his debilitated condition and his inability to perform activities of daily living. (#20, p. 6.) Defendant was noted to be incontinent of urine and he had developed "drop foot" (#20, p. 6.). He was malnourished to a weight of 119 pounds and could not stand due to extreme fatigue. (#20, p. 7.) However, by November of 2012, Defendant had begun to eat his meals and his compulsive behavior, which included hand washing, was no longer interfering with his eating and drinking. (#20, p. 6.)

Dr. Stribling Riley and Dr. Newman issued a further report of March 27, 2013, which advised that Defendant's physical condition had improved. (#23, p. 8.) Due to foot drop he was having to use a wheelchair, but his appetite had improved with a gain of weight of 30 pounds. (#23, p. 8.) By February 12, 2013, Defendant was ambulating by walking but was also using his wheelchair for up to four hours per day. (#23, p. 9.) During the period from March 27, 2013, to December 16, 2013, Defendant remained at the Federal Medical Center in Butner pending further medical assessment to determine: (1) the etiology of his medical condition; (2) whether Defendant's improvements over time would impact his competency or future dangerousness; and (3) what level of care would the Defendant require in the community. (#24, p. 3.) In a report issued by Dr. Stribling Riley and Dr. Newman filed on January 14, 2014, the psychologist and psychiatrist determined that with psychotropic treatment, Defendant's mental status and appetite had improved. (#24, p. 4.) He was discharged from the inpatient medical unit in June 2013 due to his improvements in functioning. (#24, p. 4.) Defendant spends most of his day enjoying nature in the recreation courtyard and has been responsible and reported to the officers at the designated locations and times and incurred no disciplinary infractions. (#24, p. 4.) Defendant was found to be less preoccupied with somatic delusions, but his insight

into his mental illness remains poor. (#24, p. 4.) Defendant continues to have persecutory delusions. (#24, p. 4.) In regard to his physical condition, he no longer needs skilled nursing care and can walk sometimes independently and at other times with a rolling walker. (#24, p. 5.) He is no longer wheelchair dependent. (#24, p. 5.) Defendant remains incompetent, but his ability to reoffend remains limited due to his debilitating medical condition. (#24, p. 6.)

The Government called as a witness the psychiatrist who had been treating the Defendant, that being Dr. Ralph Newman who testified as an expert in the field of psychiatry. Dr. Newman testified that his opinion the release of the Defendant would not create a risk of harm or damage to any other person or property. He further testified that on February 4, 2014, the day before the hearing in this matter, that he and the other psychologist and physicians who had been treating the Defendant, reassessed Defendant's condition and it was still the opinion of the entire treating team that the release of Defendant would not create a risk of harm or danger to any other person or property.

Dr. David Karroll testified as an expert in the field of psychiatry and in internal medicine. Dr. Karroll testified that Defendant had made a great recovery physically and it was his opinion, based upon his training and experience in

treating the Defendant, that the release of Defendant would not create a risk of harm or danger to any other person or the community.

Dr. Adeirdre Stribling Riley was called as a witness by the Government. Dr. Stribling Riley is the treating psychologist of the Defendant and testified as an expert in the field of psychology. Dr. Stribling Riley testified that she was the primary evaluator of the Defendant and she was also the primary author of the various reports that had been filed regarding the treatment of Defendant. Dr. Stribling Riley testified that she had participated in the review of February 4, 2014 of Defendant. It was Dr. Stribling Riley's opinion that the release of Defendant would not create a risk of harm or danger to any other person or property. Dr. Stribling Riley testified that although Defendant was now ambulatory, he could not care for himself. Defendant would be in need of some degree of mental health and medical treatment. Defendant cannot prepare his own meals nor can he manage money. Dr. Stribling Riley also testified that it was her opinion that Defendant would need oversight supervision.

The final witness called by the Government was William Charles Gearing, III, brother of the Defendant. Mr. Gearing is a registered nurse who works in South Carolina. William Gearing testified that the Defendant has a history of mental illness going back to when Defendant was in his early twenties. The

Defendant had some physical issues and became reclusive and disassociated himself from friends. Defendant has never had any meaningful employment and lived with his parents. William Gearing testified that in 2008, Defendant had taken Defendant's mother's car to Washington, DC to the headquarters of the FBI. At that time, Defendant was involuntary committed for a year in the District of Columbia. After the Defendant was discharged, William Gearing noticed that Defendant's psychological health had improved to a great degree, but Defendant refused to continue to take medications, despite William Gearing's repeated request that Defendant do so. William Gearing testified that by January of 2011 Defendant was paranoid and more reclusive. Many times when Defendant would go and get his mail he would go armed with an M-1 carbine that had belonged to Defendant's deceased father. Defendant accused William Gearing of poisoning Defendant's food with an x-ray machine. Defendant wrapped rope around the refrigerator in his mother and father's home and watched the refrigerator from a hole he had cut in the ceiling of the kitchen so that the Defendant could surveil the use of the refrigerator. The last time that William Gearing had seen Defendant was when Defendant was in the Transylvania County jail in January of 2011. William Gearing testified that he had never seen Defendant assault or harm any person.

William Gearing testified that a special needs trust had been established for the Defendant over which William Gearing had authority. There is located in the special needs trust the sum of approximately $60,000.

Ms. Nancy Smith was called by Defendant's counsel as the sole witness for the Defendant. Ms. Smith is a paralegal with the Federal Defender's Office in the Western District of North Carolina. Ms. Smith testified that she had done research to determine whether there were any group homes where Defendant could be housed. From her research, Ms. Smith had found there were six group homes in the Western North Carolina area. Any one of those homes could provide twenty-four hour supervision for the Defendant, which would include administration of medications for Defendant. There is a waiting list for Defendant's participation in one of the group homes. It has not been determined if there are any special types of social programs that would pay the costs of Defendant's participation in a group home setting.

**Discussion.** 18 U.S.C. § 4246(e) provides as follows:

> **(e) Discharge.**--- When the director of the facility in which a person is hospitalized pursuant to subsection (d) determines that the person has recovered from his mental disease or defect to such an extent that his release would no longer create a substantial risk of bodily injury to another person or serious damage to property of another, he shall promptly file a certificate to that effect with the clerk of the court that ordered the commitment. The clerk shall send a copy of the certificate to the person's counsel and to the attorney for the

Government.  The court shall order the discharge of the person or, on the motion of the attorney for the Government or on its own motion, shall hold a hearing, conducted pursuant to the provisions of section 4247(d), to determine whether he should be released.  If, after the hearing, the court finds by a preponderance of the evidence that the person has recovered from his mental disease or defect to such an extent that---

(1)  his release would no longer create a substantial risk of bodily injury to another person or serious damage to property of another, the court shall order that he be immediately discharged; or

(2)  his conditional release under a prescribed regimen of medical, psychiatric, or psychological care or treatment would no longer create a substantial risk of bodily injury to another person or serious damage to property of another, the shall—

(A)  order that he be conditionally discharged under a prescribed regimen of medical psychiatric, or psychological care or treatment that has been prepared for him, that has been certified by the court as appropriate by the director of the facility in which he is committed, and that has been found by the court to be appropriate;

(B)  order, as an explicit condition of release that he comply with the prescribed regimen of medical, psychiatric, or psychological care or treatment;
The court at any time may, after a hearing employ the same criteria, modify or eliminate the regimented medical, psychiatric, or psychological care or treatment.

In United States v. Taylor, 513 Fed.Appx. 287, 2013 WL 791806 (Fourth Cir. 2013)[1] the Fourth Circuit Court of Appeals set forth the criteria for decision making.

---

1  This case was not selected for publication in the Federal Reporter.

> A person committed under § 4246 may, through his counsel or legal guardian, file a motion for a hearing to determine whether he should be released. *See* 18 U.S.C. § 4247(h). The court that ordered the commitment may discharge the person if it finds, by a preponderance of the evidence, that the person has recovered from his mental disease or defect to such an extent that his unconditional release would no longer create "a substantial risk of bodily injury to another person or serious damage to property of another." Id. § 4246(e). The committed person seeking discharge bears the burden of proving that he has so recovered. *See* United States v. Evanoff, 10 F.3d 559, 563 (8th Cir. 1993); Sealed Appellee v. Sealed Appellant, 665 F.3d 620, 623 n. 4 (5th Cir. 2011).

In the Order (#22) entered on January 10, 2013, the undersigned found by a preponderance of the evidence that Defendant is presently suffering from a mental disease or defect rendering him mentally incompetent to the extent he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense. From the report that was filed on December 3, 2012 (#20), it appears there is no substantial likelihood that further treatment will lead to improvement to the extent that the Defendant's competency can be restored. The testimony of Dr. Newman, Dr. Karroll, and Dr. Stribling Riley confirm this opinion.

The undersigned must now determine whether or not a preponderance of the evidence shows that the release of Defendant would not create a substantial risk of bodily injury to another person or serious damage to the property of another. Although the burden of proof in this matter is on the Defendant, from the evidence

presented by the Government, the undersigned does make such a finding. The testimony of Dr. Newman, Dr. Karroll, and Dr. Stribling Riley and the reports that those treating medical experts provided, show by a preponderance of the evidence that the release of Defendant would not create a substantial risk of bodily injury to another person or serious damage to the property of another. The Government contends that the actions of the Defendant that led to the criminal charges against him show to the contrary. However, it appears from reviewing all the evidence presented that Defendant did not at any time ever threaten to harm any person in any way, form or fashion. All expert witnesses who testified were unanimous in their opinion that the release of Defendant would not create a substantial risk of bodily injury to another person or serious damage to the property of another. There was no evidence presented to this Court to the contrary.

Having found that the burden of proof has been met by Defendant, it does appear, however, that in 2008 when Defendant had received psychological treatment, he refused thereafter to continue with the administration of medications that provided great assistance to his psychological health. The undersigned will order, as directed, by 18 U.S.C. § 4246(e), that Defendant be released but upon a prescribed regimen of medical, psychiatric, or psychological care or treatment. The undersigned will direct that Dr. Stribling Riley and Dr. Newman, in

17

cooperation with work done by Defendant's counsel, prepare a regimen of medical, psychiatric, or psychological treatment for Defendant and present that plan of treatment to the Court within the next thirty days from the filing of this Order. At that time, the Court, will determine whether or not such regimen of treatment is appropriate and, if so, will then order that Defendant be released on conditions of release that require that he comply with the treatment plan.

## ORDER

**IT IS, THEREFORE, ORDERED** that:

(1) The Court finds by a preponderance of the evidence that the Defendant's release would not create a substantial risk of bodily injury to another person or serious damage to the property of another;

(2) The undersigned hereby **ORDERS** that Dr. Stribling Riley and Dr. Newman of the Federal Medical Center in Butner, North Carolina, in cooperation with counsel for Defendant, prepare and certify to the Court a prescribed regimen of medical, psychiatric, or psychological care or treatment for the Defendant and deliver that plan or regimen of treatment, in writing, to the Court within thirty days from the date of the filing of this Order;

(3) If the undersigned finds that the regimen of treatment is appropriate, the undersigned will enter an order releasing Defendant and will order as a condition

of release that Defendant comply with the prescribed regimen of medical, psychiatric, or psychological care or treatment; and

(4) The undersigned further **ORDERS** that a copy of this Order be delivered to the Federal Medical Center in Butner, North Carolina; counsel for the Defendant, and to the United States Attorney.

Signed: March 18, 2014

Dennis L. Howell
United States Magistrate Judge